# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BOBBY PEAK II, ) | |
| ) | |
| Plaintiff, ) | Case No. 19-cv-03351 |
| ) | |
| v. ) | Hon. Steven C. Seeger |
| ) | |
| LABORER'S UNION LOCAL #1 et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bobby Peak II brought this case against a labor union and five union officials, alleging racial discrimination. When he went to the courthouse and handed the complaint to the clerk, he also submitted an application to proceed *in forma pauperis*. He claimed – under penalty of perjury – that he was too poor to pay the $400 filing fee.

Defendants later moved to dismiss the complaint, arguing that Peak had committed fraud on the Court by making false statements in his IFP application. The gist of the motion is that Peak misrepresented his income, his employment, his home ownership, and his financial assets. Telling the truth is critical in an IFP application. The statute requires dismissal – not allows, *requires* – if an applicant makes an untrue statement about his finances.

After a careful review of the entire record, this Court concludes that Peak provided untrue information to the Court in his IFP application. He represented that he had no income when, in reality, he earned over $75,000 in the prior year. He also represented that he owned no real estate, even though he was a homeowner. He also stood by while his counsel gave this Court inaccurate information about the status of his foreclosure.

But there is reason for saving grace. Judge Coleman (the District Judge previously assigned to this case) presided over a hearing on Peak's motion to proceed *in forma pauperis*. During that hearing – which none of the parties discussed in their briefs – Peak did provide some truthful information to the Court about his finances. The truthful oral disclosures, inartful as they may have been, weigh against dismissal with prejudice based on his untruthful written disclosures.

Peak made untrue statements in his IFP application, and the statute requires dismissal when an applicant makes an untrue statement. But the statute doesn't require dismissal *with prejudice*. As a result, this Court dismisses Peak's complaint without prejudice, and grants him leave to refile after paying the full filing fee plus a fine. The motion to dismiss is granted in part and denied in part.

**Background**

Congress opened the courthouse doors to poor plaintiffs by allowing them to proceed *in forma pauperis*. To qualify, plaintiffs must submit an application that fully discloses their financial condition – and must do so under oath. *See* 28 U.S.C. § 1915(a)(1). If they demonstrate an inability to pay, the Court may waive the filing fee. *Id.*

Applicants must tell the truth. If not, the sanction is automatic. "[T]he court shall dismiss the case at any time if the court determines that . . . the allegation of poverty is untrue." *See* 28 U.S.C. § 1915(e)(2)(A). "Untrue" means something more than an innocent mistake. "Congress meant something like 'dishonest' or 'false,' rather than simply 'inaccurate.'" *Robertson v. French*, 949 F.3d 347, 351 (7th Cir. 2020); *see also Ruiz v. Bautista*, 2020 WL 974896, at *2 (7th Cir. 2020).

The Seventh Circuit has instructed that when "the allegation of poverty was false, the suit had to be dismissed; the judge had no choice." *See Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306 (7th Cir. 2002). "Shall" means "shall," not "may." *See* 28 U.S.C. § 1915(e)(2)(A); *see also Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty, so the verb phrase 'shall be applied' tells us that the district court has some nondiscretionary duty to perform.") (citation omitted). Congress "replaced the word 'may' . . . with the word 'shall'" in 1996. *See Pelmer v. Dean*, 562 F. Supp. 2d 1006, 1007 (N.D. Ill. 2008). So the question before this Court is whether Peak's IFP application was "untrue." If so, the Court must dismiss his complaint.

Peak brought his complaint to the courthouse on May 17, 2019, alleging that the union and various union officials had discriminated against him on account of his race. *See* Dckt. No. 1. Defendants have not yet filed an answer, but they previewed their defense in other filings. The punchline is that the union terminated Peak because they performed a background check on him in 2018 (after an arrest), and learned that he was arrested for a narcotics offense in 2009. *See* Dckt. No. 44, at 1-2. According to them, the Labor Management Reporting and Disclosure Act prohibits the union from employing anyone who violated the narcotics laws in the prior thirteen years, so they fired him. *Id.*

Instead of paying the filing fee, Peak filled out an application to proceed *in forma pauperis*. He basically claimed that he was too poor to pay the fee, and thus requested a waiver. The very first page underscored the importance of truthful answers: "I declare that I am unable to pay the costs of these proceedings . . . . In support of my application, I answer the following questions under penalty of perjury." *See* Dckt. No. 3, at 1.

Question two asked about his employment, in plain English: "Are you currently employed?" *Id.* Peak answered "No." *Id.* The form then asked for follow-up information. If the answer was "Yes," Peak needed to disclose his employer, and his monthly salary or wages. If the answer was "No," Peak needed to disclose when he last had a job, and how much he earned. Despite answering "No," Peak answered both of the follow-up questions by giving the same cryptic information: "Drive Construction Co." in "Bridgeview, IL." *Id.* But he left the lines about his income blank. The requests for information about his "*Monthly* salary or wages" and his "*Last monthly* salary or wages" went unanswered. *Id.* (emphasis in original).

Question four asked about his other sources of income. *Id.* at 2. "In addition to your income stated above in response to Question 2 (which you should not repeat here), have you or anyone else living at the same residence received more than $200 in the past twelve months from any of the following sources?" *Id.* Peak answered "No" to each and every question. *Id.* In particular, Question 4.A. asked about total salary or wages "received in the last 12 months," and Peak answered "No." *Id.*

The form left no stone unturned. In the interest of completeness, the application asked Peak if he had received income from "[a]ny other sources (describe source _____)" in the past 12 months, and if so, how much. *Id.* Peak answered "No." *Id.*

The application also asked Peak about his assets. In particular, the application required Peak to disclose if he owned a home. The form made clear that the applicants must disclose their home ownership even if there is a mortgage: "Do *you or anyone else living at the same residence* own any real estate (with or without a mortgage)?" *Id.* at 3 (emphasis in original). If so, the form required Peak to disclose the "current value" and the "equity," meaning the "difference between what the property is worth and the amount you owe on it." *Id.* The form

4

also asked about monthly mortgage payments. Peak's answer was simple and unequivocal: "No." *Id.*

Peak signed the form on page four, and promised that he was telling the truth under penalty of perjury. In fact, right above his signature, the form included a prominent declaration of truthfulness:

> **I declare under penalty of perjury that the above information is true and correct. I understand that 28 U.S.C. § 1915(e)(2)(A) states that the court shall dismiss this case at any time if the court determines that my allegation of poverty is untrue.**

*Id.* (emphasis in original). The content of the representation, the bold type, and the prominent placement at the top of the page sent a clear message to Peak: he needed to tell the truth, or else.

Judge Coleman (again, the District Judge previously assigned this case, before reassignment) evaluated Peak's IFP application. Critically, she presided over a hearing on July 8, 2019. *See* Dckt. No. 11. Judge Coleman placed Peak under oath, and asked him once again if the statements in his IFP application were true. He represented that his application was accurate. *See* 7/8/19 Tr., at 3:3–5. Based on his sworn application and his statements under oath at the hearing, the Court granted his petition. *Id.* at 7:9–10; Dckt. No. 11. Peak thus achieved a significant benefit, worth $400.

## Analysis

Defendants now ask the Court to dismiss this case with prejudice because Peak committed fraud in his IFP application. *See* Dckt. No. 35. They argue that Peak failed to disclose (1) his employment and his income; (2) his ownership of a home; and (3) his assets in a brokerage account. *Id.* This Court presided over oral argument on January 23, 2020, and heard from Peak directly and from his counsel. *See* Dckt. No. 43.

5

After oral argument, this Court took it upon itself to pull the transcript from the hearing before Judge Coleman on July 8, 2019. For no apparent reason, no party cited that transcript in their briefs to this Court. And the transcript makes all the difference, at least when imposing an appropriate remedy.

I. **Peak's Employment and Income**

Defendants' primary argument is that Peak failed to disclose the fact that he earned substantial income from his employment in the preceding 12 months. Defendants rest their argument on a declaration from John Conrad, a business agent for Laborers Local 1 (a labor union that represents workers in the construction industry). *See* Dckt. No. 36-1, at 7–10 of 30. Peak worked as a business agent for Laborers Local 1 until he was discharged from that role in January 2018. *Id.* at 7 of 30, ¶ 4. Before Peak was discharged, Conrad and Peak worked together as business agents for the union. *Id.* at ¶¶ 2, 4.

According to Conrad's declaration, Peak remained a member of the union after his discharge as a business agent in January 2018. *Id.* at ¶ 4. Peak continued to work on union-related jobs for two contractors: Drive Construction (the firm identified on his IFP application) and Schal Bovis. *Id.* at 8 of 30, ¶¶ 5–9. Under the collective bargaining agreements, the union kept records of his hours and his income. *Id.* at ¶ 9.

The union's records confirm that Peak gave false information to this Court. Conrad's declaration attached a copy of a Member Specific Contractor Hour Report that tallied Peak's hours and earnings. *See id.* at 12–16 of 30. The report shows that Peak was gainfully employed in the 12 months before submitting his IFP application on May 17, 2019. And he earned tens of thousands of dollars. Over $75,000, to be exact:

| Month | Hours | Gross Wages | Employer |
|---|---|---|---|
| May 2018 | 159.50 | $6,581.70 | Schal Bovis Inc. |
| June 2018 | 193 | $8,287.68 | Schal Bovis Inc. |
| July 2018 | 143 | $6,130.32 | Schal Bovis Inc. |
| August 2018 | 183 | $7,839.12 | Schal Bovis Inc. |
| September 2018 | 144 | $6,151.68 | Schal Bovis Inc. |
| October 2018 | 140 | $6,002.16 | Schal Bovis Inc. |
| November 2018 | 159 | $7,283.76 | Drive Construction |
| December 2018 | 154 | $7,006.08 | Drive Construction |
| January 2019 | 142 | $6,087.60 | Drive Construction |
| February 2019 | – | – | – |
| March 2019 | 144 | $6,322.56 | Drive Construction |
| April 2019 | 189 | $8,864.40 | Drive Construction |
|  |  | ***$76,557.09*** |  |

*Id.* at 9 of 30, ¶ 12. The declaration also attached a second business record from the union that paints the same picture. *See* Dckt. No. 36-1, at 17 of 30.

In fact, one of the busiest months of all was May 2019, when he submitted his IFP application. According to the union's records, Peak worked 180 hours that month, earning $8,052.72. *Id.* at 9 of 30, ¶ 13. Peak signed his IFP application on May 17, 2019, so it is fair to assume that he worked a substantial portion of the 180 hours in the first 17 days of the month.

In response, Peak does not dispute the numbers. He does not deny that he was employed during the 12 months before submitting his IFP application. He does not dispute that he earned over $75,000. He acknowledges that his application, to put it mildly, "contained certain errors." *See* Dckt. No. 39, at 2. He admits that his answer about his income "was false." *Id.* at 3. "Defendants are correct. Mr. Peak did earn in excess of $200 in the twelve months preceding his

7

filing of the In Forma Pauperis application." *Id.*; *see also id.* at 5 ("Mr. Peak answered no to this question. And he was wrong.").

After oral argument, Peak filed an affidavit that admitted his false statements: "In the application and affidavit, I made misstatements about my income during the 12 months preceding May 17, 2019. Specifically, I stated in the application that I had not earned more than $200 in the preceding 12 months. In fact, I had earned in excess of $75,000 in the 12 months between May 2018 and May 2019." *See* Affidavit of Bobby Peak II, ¶¶ 3–5 (Dckt. No. 45-5).

Peak insists that he did not intend to mislead the Court, and he points to the fact that his IFP application disclosed his employment at Drive Construction. *See* Dckt. No. 39, at 3; *see also* Dckt. No. 3, at 1. But Peak represented in the application that he was unemployed. He answered "No" to a simple question: "Are you currently employed?" Dckt. No. 3, at 1. And more importantly, Peak represented that he had earned $0 – not even a nickel – in the past 12 months. *Id.* A disclosure that he once worked at Drive Construction gets him nowhere because he concealed $76,557.06 of income, including $35,564.40 earned from working for that very company. *See* Dckt. No. 36-1, at 8–9 of 30, ¶ 12.

Peak offers a string of excuses. He begins by blaming – of all things – the courthouse staff. He claims that he filled out the paperwork in the Clerk's Office, and he was "rushed to finish the form" at the close of business. *See* Dckt. No. 39, at 3; Affidavit of Bobby Peak II, at ¶ 7 (Dckt. No. 45-5) ("I misstated my income because I was rushed to finalize the affidavit and get it filed while I was at the Clerk's Office."). He "rushed through the completion of the form and did not understand the question." *See* Dckt. No. 39, at 5; *id.* at 3 (claiming that his "false statement" was the "result of his being rushed to finish the form at the Clerk's Office").

The Court finds it exceptionally hard to believe that the professional staff in the Clerk's Office rushed Peak to finish the form. That's not how the public servants do their jobs. Even if he felt rushed, it's unlikely that he would forget more than $75,000 in income over the span of 12 months. And even if he was momentarily befuddled, there was no reason he needed to submit that form that day. The solution was simple: if he needed more time, he should have taken more time, and come back. If he rushed through an application that he signed under penalty of perjury, he has only himself to blame.

The Court also rejects the notion that the IFP application was confusing and that Peak "did not understand" the question. *See* Dckt. No. 39, at 5. The form posed simple questions in plain English. *See Roberts v. Rest Haven Cent.*, 2007 WL 489156, at *3 (N.D. Ill. 2007) ("The IFP clearly and unambiguously asks questions in plain English, on a form designed for use by non-lawyers."). Peak – a former official in a labor union, with some college education – had more than enough sophistication to answers questions such as "Are you currently employed?" and "[H]ave you or anyone else living at the same residence received more than $200 in the past twelve months from any of the following sources?" *See* Dckt. No. 3, at 1–2.

After oral argument, Peak offered new excuses in an affidavit. He began by blaming his eyes. Peak swears under oath: "I did not have my reading glasses with me when I filled out the application." *See* Affidavit of Bobby Peak II, at ¶ 8 (Dckt. No. 45-5). His eyes apparently weren't bad enough to prevent him from completing the form in neat handwriting. He filled in the blanks right where he should have, and he checked all of the boxes right on target. *See* Dckt. No. 3. His eyes didn't prevent him from telling the truth.

He then blames the fact that he was taking painkillers. "On May 17, 2019, I was taking pain medication for injuries sustained during the course of my employment. This medication

9

may have made me less able to pay attention to detail." *See* Affidavit of Bobby Peak II, at ¶ 12 (Dckt. No. 45-5). But Peak didn't give that excuse in his response brief, or at oral argument. It emerged for the first time in an affidavit filed later. The belated appearance of that explanation adds to its implausibility. His story violates a simple maxim: when you're in a hole, stop digging.

In sum, this Court carefully surveyed all of the evidence, and listened to Peak at the hearing. This Court finds that Peak provided untrue information to the Court about his income and his employment in his IFP application. It was not a mistake or an oversight. It was deception, plain and simple.

But there is one mitigating factor, and it is a big one. At the hearing before Judge Coleman on July 8, 2019, Peak reaffirmed that everything in his IFP application was true. He initially told the Court that he earned approximately $1,700 per *month* before he was laid off. *See* 7/8/19 Tr., at 4:17–24. But later in the hearing, Peak clarified that he earned $1,700 per *week*, not per month:

| | |
|---|---|
| **Court:** | $1,700 a month, even that does not seem like that would support – |
| **Mr. Peak:** | No, per week, Judge. It's per week. |
| **Court:** | Oh, it's per week? |
| **Mr. Peak:** | Yes. 40 hours. 43.74 – |
| **Court:** | Okay. That's different. All right. So $1700 a week approximately? |
| **Mr. Peak:** | Uh-huh. Before taxes. I get – |
| **Court:** | Before – I get it. Before taxes. So you're talking about almost $6,000 -- |
| **Mr. Peak:** | I get like 1100. |

| | | |
|---|---|---|
| **Court:** | | – a month. |
| **Mr. Peak:** | | 1100. 1100. |
| **Court:** | | Okay. All right. That makes me feel a little bit better. All right. So – all right. The IFP will be granted after questioning by this Court. |

*See* 7/8/19 Tr., at 6:20 – 7:10.

Based on the back-and-forth, it appears that Peak made a truthful statement, but it is unclear whether Peak and the Court had a meeting of the minds. The onus was on Peak to set the record straight. He did not exactly come clean, clear the air, and fully disclose that he had earned $75,000 in the past year. Peak continued to talk while the Court was talking, and even if the Court heard him, his terse oral statement required a mathematical computation on the fly, in the face of oral and written representations of poverty.

Still, Peak did say something truthful (or in that neighborhood) about his income shortly before the Court ruled on his IFP application. His belated revelation counts for something and weighs in the analysis of the appropriate remedy.

## II. Peak's Home Ownership

Defendants also argue that Peak concealed his ownership of a home. Peak represented that he did not own any property. *See* Dckt. No. 3, at 3. But public records from the Cook County Recorder of Deeds reveal that Peak owned a home in the south side of Chicago. *See* Declaration of David P. Lichtman, at 20–21 of 30, ¶¶ 5–7 (Dckt. No. 36-1).

The property records confirm the home ownership. The warranty deed from 2014 lists Peak as the grantee (Dckt. No. 36-1, at 22 of 30), and a release of lien from January 2018 identifies Peak as the mortgagor (Dckt. No. 36-1, at 24 of 30). The lender filed a notice of foreclosure in August 2019 – a few months after the IFP application – and identified Peak as the

"title holder[] of record." *See* Dckt. No. 36-1, at 26 of 30. According to the Cook County Assessor's Office, the property had an estimated value of $129,550 (Dckt. No. 36-1, at 21 of 30, ¶ 8; *id.* at 29), but the amount of equity (that is, the market value less the mortgage loan) remains unknown.

Peak defended his answer in his response brief, arguing that "his property was going into foreclosure and was about to be seized by the bank." *See* Dckt. No. 39, at 4. "On the date in question," he argues, "Mr. Peak believed that he no longer owned the property in question." *Id.* "[T]he mortgage had been cancelled and he was subject to imminent eviction. Therefore, Mr. Peak reasonably believed that he was no longer the owner of the property." *Id.*

At the hearing, Peak's counsel had no good answer to a simple question about his failure to disclose:

> **Court:** Here's what I don't understand: Why wasn't he forthcoming with the Court and say, "Yes, I own a home, but it's in foreclosure?" He could have done that. But now I've got a situation where he promised to the Court under penalty of perjury that he didn't own a home, and I know that to be untrue.
>
> **Counsel:** You are correct. He could have absolutely been more forthcoming.

*See* 1/23/20 Tr., at 9:2–9 (Dckt. No. 43).

Plaintiff's counsel admitted that Peak did, in fact, own the home when he submitted his IFP application. But she insisted that he was confused because the property was in foreclosure proceedings at the time:

> **Court:** On May 17, 2019, did Mr. Peak own a home at 352 West 97th Street in Chicago? "Yes" or "No"?
>
> **Counsel:** Yes.
>
> **Court:** Okay. When did it go into foreclosure?

12

| | | |
|---|---|---|
| **Counsel:** | Prior to that date by – | |
| **Mr. Peak:** | Yeah. | |
| **Counsel:** | Three months? | |
| **Mr. Peak:** | Mm-hmm. | |
| **Counsel:** | – by approximately three months. So in February 2018.[1] | |

*Id.* at 8:1–10 (Dckt. No. 43). She continued: "Foreclosure proceedings had been initiated. A sheriff sale had not yet been scheduled, but Mr. Peak was informed that the home would be taken from him." *Id.* at 8:15–17.

That excuse imploded before this Court's very eyes at the hearing. Defense counsel presented the docket from the foreclosure proceeding, and pointed out that it was not filed until the end of July 2019 – more than two months *after* Peak filed his IFP application. *Id.* at 12:6–14:15. The docket from the foreclosure proceeding (which was later filed on this Court's docket at Dckt. No. 41) confirms that it began on July 29, 2019. *See* Dckt. No. 41; *see also* Dckt. No. 36-1, at 26–27 of 30 (Lis Pendens and Notice of Foreclosure dated August 1, 2019).

Peak's counsel responded: "News to me." *See* 1/23/20 Tr., at 14:18 (Dckt. No. 43). After conferring with Peak, Plaintiff's counsel abandoned the story that the house was already in foreclosure when he submitted his IFP application. Instead, the new position was that the bank was *threatening* foreclosure. *Id.* at 15:8–16:2.

Maybe so. But that wasn't a reason to hide the home from the Court. If the house was about to be in foreclosure – or if it was under water, meaning it was worth less than the debt – then Peak should have said so. The IFP form expressly asked about the value of the home, and

---

[1] Counsel presumably meant 2019. February 2019 is "three months" before Peak filed the IFP application in May 2019.

13

the amount of equity. *See* Dckt. No. 3, at 3. But in his IFP application, Peak disclosed nothing. He didn't even reveal the existence of the property. And in the meantime, he stood by while his counsel gave this Court inaccurate information in an attempt to explain his false IFP application.

Overall, after carefully surveying the record, this Court finds that Peak provided untrue information about his ownership of real estate in his IFP application. He represented that he did not own a home, but he did own a home.

But once again, the transcript of the hearing before Judge Coleman on July 8, 2019 casts things in a different light. The Court asked Peak where he lived, and he told the Court that he owned a house:

| | | |
|---|---|---|
| **Court:** | | And what type of home do you live in? |
| **Mr. Peak:** | | I own my house, which I just recently had to do a modification because I'm behind on my mortgage. |
| **Court:** | | All right. So you had a house, is that correct? |
| **Mr. Peak:** | | Yes, I own my house, yes. |

*See* 7/8/19 Tr., at 5:5–10.

So, once again, Peak provided false information to the Court in his IFP application. But at the hearing before Judge Coleman, Peak dribbled out a morsel of truth. He said one thing in writing, but said something else in the courtroom. But the Court did know about his home ownership before granting the IFP application.

### III. Peak's Misdirection about His Portfolio

In addition to the false statements about his employment, his income, and his home, Defendants argue that Peak lied about his investment portfolio. They attach a pair of texts that Peak sent to John Conrad (again, the union official) in April 2019. *See* Dckt. No. 36-1, at 10 of 30, ¶ 16; Dckt. No. 36-1, at 18–19 of 30. The first text included a screen shot of a financial

14

account with a "Portfolio Balance" of "$164,071.94." Dckt. No. 36-1, at 18 of 30. According to Defendants, the texts are inconsistent with Peak's representation in his IFP application. Peak represented that he did not have more than $200 in cash or bank accounts, and did not own any stocks, bonds, securities, or other financial instruments. *See* Dckt. No. 3, at 2–3.

In response, Peak admits that he peddled false information. But he claims that he was misleading *John Conrad*, not this Court. That is, Peak claims that he was merely bluffing when he sent the texts to Conrad. Apparently, he sent Conrad a screenshot of an account belonging to a friend. And he did so, he claims, simply to "show off," to give Conrad the misimpression that Peak was wealthy. *See* 1/23/20 Tr., at 19:3–21:4 (Dckt. No. 43).

Peak's alibi does not inspire confidence. His story is that he wasn't deceiving *the Court* in his IFP application because he was deceiving *someone else* when he sent those texts. He offers an I-wasn't-lying-to-you, I-was-lying-to-him defense:

> **Court:** His story is that he was not being truthful with someone about his finances, which makes me wonder if he's being truthful with me about his finances. Do you understand the – I mean, the alibi confirms my suspicion.
>
> **Counsel:** Judge, I absolutely, sympathize with your concerns. And, you know, frankly, this kind of childish gamesmanship is what gets us all here in the first place. And it's difficult to explain.

*See* 1/23/20 Tr., at 21:8–15 (Dckt. No. 43). Peak admitted that he was attempting to mislead Conrad about his financial situation:

> **Court:** Were you trying to mislead Mr. Conrad by giving him the impression that this was your account?
>
> **Mr. Peak:** To be honest with you, Judge, I was – yes, I was. Because they know I'm financially ruined, so that's why I did it.

15

*Id.* at 24:14–18.

After the hearing, Peak filed a larger collection of texts that he had exchanged with his friend (Sheila King) who owned the account. *See* Dckt. No. 45-1. Based on its review, the Court concludes that the account does, in fact, appear to belong to Ms. King, and thus Peak did not provide false information in response to those particular questions on the IFP application. Still, the episode is not irrelevant. It underscores Peak's propensity to provide false information about his finances when he thinks it serves his interests.

## IV. The Sanction

Peak perpetrated a fraud on the Court by providing false answers and hiding the truth in his IFP application. So the last remaining issue is the appropriate sanction.

Defendants request dismissal with prejudice. Peak asks this Court to order him to pay the full filing fee plus a fine, but not end the case. *See* Dckt. No. 39, at 7. Dismissal with prejudice is one of the options on the table, especially on this record. *See Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 308 (7th Cir. 2002); *Mullins v. Hallmark Data Sys., LLC*, 511 F. Supp. 2d 928, 930 (N.D. Ill. 2007).

"Proceeding in forma pauperis is a privilege, and courts depend on the plaintiff's honesty in assessing her ability to pay. Abusing this privilege warrants dismissal with prejudice as a sanction for lying." *Lofton v. SP Plus Corp.*, 578 Fed. Appx. 603, 604 (7th Cir. 2014). Courts have dismissed cases with prejudice based on comparable misrepresentations. *See Thomas*, 288 F.3d at 306–08 (affirming dismissal with prejudice when the plaintiff failed to disclose nearly $59,000 in income); *Mathis v. New York Life Ins. Co.*, 133 F.3d 546, 547 (7th Cir. 1998) (affirming dismissal with prejudice when the plaintiff "did not disclose [on his IFP application] that he owned a home with approximately $14,000 of equity").

16

Providing false information to the Court is serious business. One could argue that "[n]o fraud is more odious than an attempt to subvert the administration of justice." *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251 (1944) (Roberts, J., dissenting). "Perjury is a fraud on the court. It strikes at the heart of the integrity of the judicial system and is incompatible with the values underlying any system of justice." *See Mullins v. Hallmark Data Sys., LLC*, 511 F. Supp. 2d 928, 942–43 (N.D. Ill. 2007) (citations omitted) (granting a motion to dismiss with prejudice based on IFP fraud).

The statute requires dismissal, but it does not require dismissal with prejudice. "Congress intended to leave the decision to dismiss with or without prejudice in the district court's discretion." *See Mathis*, 133 F.3d at 548 (quoting *Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 756 (7th Cir. 1988)) (cleaned up). This Court has carefully considered the options, including imposing a lesser sanction and dismissing this case without prejudice. *See Hoskins v. Dart*, 633 F.3d 541, 544 (7th Cir. 2011).

In many respects, Peak has earned dismissal with prejudice. He concealed tens of thousands of dollars of income from this Court. He failed to disclose his ongoing employment. He gave inaccurate information about his home ownership. And he stood by while his counsel gave this Court incorrect information about the timing of his foreclosure. The magnitude of his true income and the length of his employment confirm that the false statements were not an innocent oversight.

But at the hearing before Judge Coleman, Peak told the truth. Or at the very least, he told *enough* of the truth to avoid dismissal with prejudice. He didn't exactly make things crystal clear to the Court. He hid more than he disclosed. Still, he did provide truthful information right before the Court ruled.

His belated truth-telling does not change the fact that Peak provided untrue information to the Court in his IFP application. He did. And it doesn't cure Peak's false written statement. But it is enough to avoid the ultimate sanction of dismissal with prejudice. As Peak requested, this Court will order him to pay the full filing fee, plus a fine.

**Conclusion**

The motion is granted in part, and denied in part. The complaint is dismissed without prejudice. Peak shall pay the full $400 filing fee by April 24, 2020. Peak also shall pay a fine of $500 by that date. If Peak does not pay the full $900 by April 24, 2020, this Court will close this case.

The Court notes that Defendants also moved to dismiss on separate, substantive grounds earlier in the litigation. *See* Dckt. No. 22. The Court has already ruled on that motion, granting it in part and denying it in part. *See* Dckt. No. 50. In that ruling, the Court granted Plaintiff leave to amend his complaint by April 24, 2020. Taking the two rulings together, the next steps are the same: to continue with this litigation, Peak must pay the $400 filing fee and a $500 fine. And he must file an amended complaint by April 24, 2020.

Date: March 24, 2020

Steven C. Seeger
United States District Judge