IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BOBBY P. PEAK II,<br><br>     Plaintiff,<br><br>  v.<br><br>LABORERS UNION LOCAL NO. 1,<br>and LEO ESPARZA,<br><br>     Defendant. | No. 19-cv-3351<br><br>Judge Franklin U. Valderrama |

MEMORANDUM OPINION AND ORDER

Plaintiff Bobby P. Peak II (Peak), worked for Defendant Laborers' Local No. 1 (Local 1) as a Business Agent. Defendant, Leonel Esparza (Esparza) (collectively with Local 1, Defendants), was Local 1's Business Manager and Peak's supervisor. Local 1 allegedly fired Peak after it discovered that he had a felony record which disqualified him from holding the position of Business Agent under the Labor-Management and Reporting Disclosure Act of 1959, ("LMRDA"), 29 U.S.C. § 504(a). Peak, an African-American, sued Defendants for race discrimination, race-based harassment during his employment, and retaliation under 42 U.S.C. § 1981 (Section 1981). R.[1] 60, Am. Compl.[2]

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

[2]Peak dismissed the remaining counts in his Amended Complaint with prejudice. R. 80, Stipulation to Dismiss.

Before the Court is Defendants' motion for summary judgment (Motion) pursuant to Federal Rule of Civil Procedure 56. R. 122, Mot. Summ. J. For the reasons stated below, the Court grants in part and denies in part Defendants' Motion.[3]

## Background

### I.      Local Rule 56.1 Statements and Responses

Before considering the merits of the Motion, the Court first addresses certain objections to, and evidentiary issues with, certain statements of fact, and Peak's alleged failure to comply with the Northern District of Illinois' local rules relating to the statement of facts.

When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acq. Co., LLC v. AIP Products Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1)). The L.R. 56.1 Statement must cite to specific pages or paragraphs of the documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)). Under Local Rule 56.1(b) and (e), the nonmovant must

---

[3]Citations to the parties' briefs are identified as follows: "Mot. Summ. J." for Defendants' Motion for Summary Judgment; "Memo. Summ. J." for Defendants' Memorandum of Law in support of its Motion for Summary Judgment (R. 124); "DSOF" for Defendants' Local Rule 56.1 Statement of Undisputed Facts (R. 123); "Resp. DSOF" for Peak's Response to Defendants' Statement of Undisputed Facts (R. 129); "PSOAF" for Peak's Local Rule 56.1 Statement of Additional Facts (R. 129, beginning on p. 33); "Resp." for Peak's Response to Defendants' Motion for Summary Judgment (R. 130); "Resp. PSOAF" for Defendants' Response to Peak's Statement of Additional Facts (R. 138); "Reply" for Defendants' Reply in support of its Motion for Summary Judgment (R. 137).

counter with a response to the separate statement of facts, and either admit each fact, or, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Id.*; *see Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."); *see also Daniels v. Janca*, 2019 WL 2772525, at *1–2 (N.D. Ill. July 2, 2019). If the non-moving party asserts additional facts not included in the moving party's statement of facts, the non-moving party is to file a statement of additional material facts "that attaches any cited evidentiary material not attached to the [moving party's statement of facts] or the non-moving party's response [thereto]." N.D. Ill. Local R. 56.1(b)(3). The Seventh Circuit has repeated that "a district court may strictly, but reasonably, enforce local rules." *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021).

Defendants argue that Peak violated the Local Rules. Specifically, Defendants contend that Peak violated the Local Rules by "inserting new, alleged statements of facts without citing to a L.R. 56.1 statement or response." Reply at 1. Defendants ask the Court to strike said statements. *Id.* at 2–3.

The Court agrees with Defendants that Peak has disregarded Local Rule 56.1 by relying on facts throughout his response brief which are not included in his L.R.

56.1 Statement or response to Defendants' L.R. 56.1 Statement. *See* Reply at 2–3 (itemizing alleged facts which do not cite to any L.R. 56.1 Statement or response)."[P]roviding additional facts in one's responsive memorandum is insufficient to put those facts before the Court." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000); *see also Igasaki*, 2018 WL 4699791 at *2 ("Citing directly to new facts in the opposition brief is a clear violation of Local Rule 56.1."). Accordingly, where Peak includes a statement of fact in his response without citing to the summary judgment record to support that statement of fact, the Court will not consider the unsupported statement. Further, the Court admonishes Peak for citing to the record and not to the statement of fact in violation of Local Rule 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."); s*ee Little v. Ill. Dept. of Pub. Health*, 2020 WL 1530736, at *1 (N.D. Ill. Mar. 31, 2020) (disregarding facts set forth in response brief and not within a statement of facts, including when plaintiff cites directly to the record instead of a statement of fact).

The Court now turns to resolving specific evidentiary objections made in the responses to certain statements of fact. Peak launches several hearsay objections to communications between himself and other Local 1 employees or Business Agents contained in Defendants' Statement of Facts. *See* Resp. DSOF ¶¶ 15–16, 18–22, 29–33, 43, 71. Peak also objects to most of those communications based on lack of foundation or authentication. Resp. DSOF ¶¶ 16, 18–22, 29–33, 43, 71. Peak also objects to photographs based upon a purported lack of foundation or authentication.

*Id.* ¶ 98. Last, Peak objects to one statement of fact as calling for a legal conclusion. *Id.* ¶ 45. The Court addresses each objection, in turn, below.

### A. Hearsay Objections

Peak argues that certain text messages relied upon by the Defendants between himself and other Local 1 employees or Business Agents constitute inadmissible hearsay. *See* Resp. DSOF ¶¶ 15–16, 18–22, 29–33, 43, 71. Surprisingly, Defendants fail to address the hearsay objections in their reply brief. Therefore, Defendants waive any response. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.")

"An out-of-court statement offered to prove the truth of the matter asserted is generally inadmissible hearsay. Conversely, an out-of-court statement is not hearsay—and is generally admissible—if it is not offered to prove the truth of the matter asserted." *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018) (cleaned up).[4] In deciding a motion for summary judgment, the Court may only consider evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, the evidence offered at summary judgment must only "be of a kind admissible at trial" and "it need not be in the precise form that it would be offered (or admissible)" at trial. *Taylor v. Dart*, 2022 WL 4483908, at *2 (N.D. Ill. Sept. 27, 2022), *appeal dismissed sub nom. Taylor v. Pretty*, 2023 WL 7279288 (7th

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Cir. June 1, 2023) (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 & n.2 (7th Cir. 1994)).

As a preliminary matter, the text messages that Peak sent do not constitute hearsay. *See* Fed. R. Evid. 801(d)(2)(A); *see United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) ("The text messages [the defendant] sent are his own statements and as such are excluded from the definition of hearsay by Rule 801(d)(2)(A).") As for the text messages sent by others, as the Court understands it, Defendants primarily rely upon the text messages not for the truth of the matter asserted within the text messages, but as examples of the nature and kind of communications between Peak and his co-workers at Local 1, and the effect of the communications on Peak as the listener, which is permitted. *See* Fed. R. Evid. 801(c). On this basis, the Court may consider the communications not for the truth of the matter asserted within the communications, but for context of the relationship between Peak and his co-workers, and the effect of the communications on Peak as the listener, provided that Defendants have laid a foundation for such communications. *See Noone v. Presence Hosps. PRV*, 149 F. Supp. 3d 904, 909 (N.D. Ill. 2015) (collecting cases finding out-of-court statements introduced to show the effect on the listener are not hearsay).

### B. Foundation Objections

Peak also objects to the admissibility of certain text messages based on lack of foundation or authentication. *See* Resp. DSOF ¶¶ 16, 18–22, 29–33, 43, 71, 98. Interestingly, Peak cherry-picks the text messages he claims lack foundation. Not surprisingly, he takes no issue with those text messages which support his narrative,

but objects to those text messages that undermine his claims. *See id.*; *cf. with* PSOAF ¶ 11. The Court considers Peak's objections below.

"When an objection to summary judgment evidence is raised, the objected-to-evidence maybe considered 'only if the court concludes that the evidence would be admissible at trial.'" *Keenan v. Home Depot U.S.A., Inc.*, 2021 WL 4264358, at *22 (N.D. Ill. Sept. 20, 2020) (quoting *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020)). "Thus, when an objection is raised, documents must be authenticated by an affidavit that lays a proper foundation for their admissibility." *Id.* Federal Rule 901(a) governs the authentication of evidence and provides that, to authenticate an item of evidence, the proponent "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Jackson*, 940 F.3d 347, 351 (7th Cir. 2019) (quoting Fed. R. Evid. 901(a)).

Here, while Esparza submitted a Declaration in support of Defendants' Motion, he failed to authenticate the text messages objected-to by Peak on the basis of lack of foundation or authentication. *See* R. 123-2, Esparza Decl.; *see* Resp. DSOF ¶¶ 16, 18–22, 29–33, 43, 71.  In reply, Defendants in large part fail to address Peak's arguments relating to foundation objections, or to otherwise attempt to authentic the objected-to text messages. Nor do the Defendants submit an affidavit or declaration addressing the foundation objections asserted by Peak. *Keenan*, 2021 WL 4264358 at *8 ("documents must be authenticated by an affidavit that a proper foundation for their admissibility[.]") (cleaned up).

However, Defendants purport to address certain authentication objections in a footnote. As an initial matter, "[a]rguments in footnotes are typically waived." *Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016); *see also* J. Valderrama Standing Order, Memorandum of Law Requirements ("Generally, the Court will not consider substantive arguments contained in footnotes."). Turning to Defendants' arguments submitted in the footnote, Defendants point to Esparza's Declaration in providing a foundation for the photographs (Reply at 13, n.19), Peak's own testimony in authenticating text messages between himself and Esparza where Peak referred to Esparza as his "brother from another mother" and other terms of endearment (*id.* n.20), and Peak's own testimony authenticating text messages between himself and Esparza relating to Peak's mother's death anniversary. *Id.* n.23.

The Court overrules Peak's objection to the photographs based on Esparza's Declaration, which provides the approximate date, and identity of individuals, and event depicted in each photograph. Resp. DSOF ¶ 98; Esparza Decl. ¶ 18. This is sufficient for purposes of Rule 901. *See Black & Decker Corp. v. Positec USA Inc.*, 2015 WL 5612340, at *11 (N.D. Ill. Sept. 22, 2015) (cleaned up) ("A sufficient foundation is laid for a still photograph by testimony of any person . . . with personal knowledge at a time relevant to the issues of the subject matter depicted in the photograph sufficient to support a finding that the photograph is a fair and accurate representation of the subject matter depicted at that time.").

Turning to the text messages, the Court finds that Peak's testimony acknowledging that he sent certain text messages is sufficient to support that the text messages are what they are claimed to be. *See* Fed. R. Evid. 901(a) and (b)(1); *see also Lewisbey*, 843 F.3d at 658 ("To authenticate the text messages, [the propounding party] needed only to 'produce evidence sufficient to support a finding' that the messages were actually sent and received by [defendant]."); *see also Rodriguez v. City of Berwyn*, 2018 WL 5994984, at *3 (N.D. Ill. Nov. 15, 2018) (testimony that party-opponent sent texts was sufficient to support finding that the text messages were what plaintiff claimed them to be).

Peak asserts, without specifying, generalized objections to text messages as lacking sufficient foundation. To the extent the statement of fact includes text messages Peak sent to others in Local 1, and where Peak testified about the specific text message during his deposition, the Court finds the objection meritless as those text messages sent by Peak were authenticated through Peak's testimony. *See Lewisbey*, 843 F.3d at 658; *see* DSOF ¶¶ 16(b), 18–20; 22; 29; 31–33; and 43.[5] Although Peak does not explicitly argue that the text messages sent by individuals other than himself are unauthenticated, the Court agrees with Peak that Defendants have failed to authenticate those text messages through any affidavit, declaration, or otherwise. However, where the text message is supported by testimony from the declarant that

---

[5]To the extent Peak's text messages are not supported by citation to Peak's testimony by Defendants, the Court finds those text messages are not authenticated. *See*, *e.g.*, DSOF ¶¶ 16(c)-(d), 21, 30, and 71; *see*, *e.g.*, *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

they sent the text message, the Court finds those messages are authenticated. *See Rodriguez*, 2018 WL 5994984 at *3; *see* DSOF ¶ 71 (Flanagan text message).

Thus, the Court will consider the text messages sent by Peak, and which he testified about, but will not consider text messages sent by others which are objected to by Peak, and which are not supported by any affidavit, declaration, or testimony from the declarant.[6]

### C. Legal Conclusion Objection

Last, the Court addresses Peak's objection to DSOF ¶ 45 as calling for a legal conclusion. Specifically, Peak objects that he cannot respond to the statement of fact that Peak "attempted to induce Esparza to admit that Peak had disclosed his felony convictions during the 2016 pre-hire meeting" as calling for a legal conclusion. Generally, legal conclusions are conclusions that will determine the outcome of a case, or a legal issue in a case, and are inadmissible. *See*, *e.g.*, *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007).

The Court overrules the objection. That portion of the statement of fact does not call for a legal conclusion. If Peak disagreed with the statement, he was free to dispute the statement with evidence in the record, and he did not. Thus, the Court considers the statement admitted.

### D. Defendants' Objections

Turning next to Defendants' objections to certain of Peak's statement of facts, Defendants object on the basis of a statement being "incomplete, incomprehensible,

---

[6]Even if the Court could consider the other text messages offered by Defendants in the specified DSOF, it would not change the outcome of the Court's opinion.

and not susceptible to an informed response." *See* Resp. PSOAF ¶¶ 28, 38. Upon review of the statement of fact – that "Peak never received an answer from Marty on why he was moved to the northwest suburbs" and that "Peak stated that everyone was aware of Peak's criminal background history and still moved to appoint Peak as a Business Agent" – the Court disagrees. *Id.* Thus, the Court considers the foregoing statements admitted, unless Defendants have identified record evidence in their response to dispute the asserted fact.

The Court now turns to the material facts in the case, subject to the foregoing rulings, as it relates to the challenged claims.[7]

## II. Material Facts

The following facts are set forth favorably to Peak, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Peak's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed, to the extent the disputed facts are supported by record evidence.

---

[7]To the extent any party objected to certain statements of fact on the basis that they misstate or mischaracterize the record or testimony, the Court considers those objections in the Material Facts Section II, *infra*, as applicable.

## A.      Background

Local 1 is a labor organization and the bargaining agent of laborers that perform construction work within the City of Chicago and Chicago suburbs. DSOF ¶ 1. Local 1 is an affiliate of the Construction and General Laborers' District Council of Chicago and Vicinity (Chicago District Council) and the Laborers' International Union of North America (LIUNA). *Id.* Esparza has been Local 1's Business Manager, and principal officer, since approximately May 2015. *Id.* ¶ 2. In that role, Esparza supervises Local 1's Business Agents and administrative staff, and has the authority to terminate Business Agents. *Id.*

## B.      Peak's Employment with Local 1

Peak was hired by Local 1 as a Business Agent in May 2016. DSOF ¶ 3.[8] The Local 1 Executive Board voted on and approved his hiring. *Id.* ¶ 4. At that time, Peak had been serving as one of Local 1's Auditors. *Id.* ¶ 5. Peak was the first African-American Business Agent employed by Local 1 after a November 2014 merger. Resp. PSOAF ¶ 10.

Before his hire as a Business Agent, members of the Local 1 Executive Board, including Esparza, Vice President Marty[9] Flanagan, Secretary Treasurer Peter Fosco, and President Frank Damato, met with Peak and asked whether he had a criminal background. DSOF ¶¶ 4, 6. It is undisputed that a background check was

---

[8]Peak also asserts that he was a member or officer of the Laborers Brotherhood United, although that entity is not a named defendant in this matter, and also contends that it is the supervisory international union to Local 1. PSOAF ¶¶ 2–3.

[9]Local 1 does not include Flanagan's first name, however, the Court understands it is "Marty" from the briefing and Peak's responses to the DSOF. DSOF ¶ 4.

not conducted by Local 1 on Peak prior to his hire. *See* DSOF ¶ 37; Resp. PSOAF ¶ 5. It is also undisputed that Peak's criminal record includes the following convictions: (1) 1996 conviction for possession of a controlled substance; (2) 2000 conviction for "aggravated fleeing"; (3) 2012 felony conviction for cocaine possession; and (4) 2016 conviction for illegal possession of ammunition. Resp. DSOF ¶ 7.

The parties dispute whether Peak disclosed his entire criminal record before his hire as a Business Agent and, specifically, whether he disclosed his felony conviction. DSOF ¶ 8; Resp. DSOF ¶ 8; PSOAF ¶¶ 6, 8; Resp. PSOAF ¶¶ 6, 8. Peak insists he disclosed that an ex-girlfriend put cocaine in his car and he was convicted for it, and took probation for the charge (Resp. DSOF ¶ 8), whereas Esparza and Flanagan recall that Peak referenced an issue with an ex-girlfriend that may have resulted in an arrest or misdemeanor, but deny that Peak disclosed any felony conviction or period of incarceration. DSOF ¶ 9; PSOAF ¶ 39; Resp. PSOAF ¶ 39. Peak further asserts that he disclosed that he was incarcerated for four and a half years and was convicted for cocaine possession. PSOAF ¶ 8. Peak also contends that after he disclosed his criminal background, Flanagan stated "drugs, is that all?" and then all members of the Executive Board approved his hire. *Id.* ¶ 9. Peak posits that Esparza knew of his criminal conviction but still appointed him as Business Agent in order to court African-American votes in the 2018 election. PSOAF ¶ 34.

From May 2016 to January 2018, Local 1 employed three Business Agents, including Peak, Damato, and John Conrad. DSOF ¶ 10. The role of Business Agent includes "ensuring contractor compliance with the applicable collective bargaining

13

agreements (for 'policing' union contractors), servicing Local 1's members by, for example, processing grievances on behalf of members, signing up new members, and assisting in organizing non-union contractors." DSOF ¶ 11. Business Agents spend most of their time traveling and patrolling their assigned areas in the field. *Id.* Peak primarily communicated with the other Local 1 officers and Business Agents by text message and telephone. *Id.* ¶ 13.

### C. Work Environment & Relationship with Officers and Other Business Agents

Peak referred to Esparza and the other Local 1 officers and Business Agents as his "brothers." DSOF ¶ 14; Peak Dep. Tr. at 135: 14–18. Peak maintains that "brother" is a common word used in the labor industry. Resp. DSOF ¶ 14. Flanagan testified that Peak had a "great attitude . . . was fun to hang around with . . . We were always laughing and joking around together." DSOF ¶ 17. Flanagan further testified that Peak was likeable and had a good personality. PSOAF ¶ 31. Peak testified that he and Pagano referred to each other as "brothers." DSOF ¶ 18. Peak and Esparza dispute whether they were personal friends, or merely business colleagues. DSOF ¶ 24; Resp. DSOF ¶ 24. However, it is undisputed that Peak and Esparza exchanged gifts during holidays, and that Peak bought gifts for Esparza's children. Resp. DSOF ¶ 26. Text messages sent by Peak to Esparza and others in Local 1 demonstrate that Peak shared positive feelings about Local 1 and referred to others as "brothers," referred to himself as a "brother from another mother" to Esparza, supported Esparza's officer election, discussed personal matters with Esparza, and that he reacted with affirmation to certain text messages sent by others. *See*, *e.g.*, DSOF ¶¶

16(b), 18–20; 22; 29; and 31–33. Other text messages demonstrate that Peak felt employees of Local 1 had turned their back on him when he was discharged. *Id.* ¶ 43.

Peak complains of several incidents and/or communications as supportive of his claims against Defendants, detailed below.

### 1. Text Messages

Peak identifies several text communications he found racially offensive. These communications include a 2016 text message sent by Esparza of an African-American male wearing an orange shirt with the caption "New Local One BA Bobby Peak"; Resp. DSOF ¶ 62; Def. Exh. 22.[10] Peak found this text message demeaning because the individual was in a "prison jumpsuit." *Id.*; PSOAF ¶ 17. Peak contends he could not have complained about the "New Local One BA Bobby Peak" text message for fear of being fired. Resp. DSOF ¶ 64. Esparza explains that he did not intend to insinuate that Peak was a criminal by circulating the photo, and that LIUNA's colors were orange like the photo he sent, and he sent the photo because he thought the man in the photo looked like "a badass." DSOF ¶¶ 65–67. Flanagan, however, testified that he could not recall another similar photograph being circulated when Business Agent Pagano, who is Caucasian, was hired. PSOAF ¶¶ 18–19.

Another text message Peak found offensive was a screenshot from Flanagan of a news article containing an image of a suspected bank robber captioned "surveillance image of the suspect in four recent bank robberies" where Flanagan wrote "Dude you

---

[10]It is unclear who Esparza shared this text message with based upon the briefing, as the Defendants' Exhibit 22 only includes the photograph described in the text message. R. 123-3, Def. Exh. 22.

got some splaining to do. Bobby Bobby Bobby." DSOF ¶ 71; PSOAF ¶ 11; Def. Exh. 23. Peak states that he was offended because the text message insinuated that he was a criminal, and responded that it was the fruits of his labor that allowed him to purchase his possessions. Resp. DSOF ¶ 72; PSOAF ¶ 14. Peak did not complain to anyone at Local 1, but contends he shared his concerns with other union members. *Id.* Esparza testified he did not mean to suggest Peak obtained his "toys" through criminal activities. DSOF ¶ 73.

Other text messages which Peak found offensive included (1) a meme of a goat with two guns on its side and the caption "I'll be damned if I get raped by a muslim today," (2) a meme of boxer Floyd Mayweather wearing a face mask captioned "[w]hen u don't pay your taxes but don't want the IRS to know it's you collecting 100 million," (3) a text where Pagano wrote to Local 1 Business agents "[y]ou're like a fucking Jehovah witness with all the doors you must knock on[,]" and (4) a text from Esparza showing an African American female with her legs open with the message "no sign ups, no pussy." DSOF ¶¶ 74, 76, 78; PSOAF ¶ 20. Peak also identified another text which had a weatherman touching a large pink penis. PSOAF ¶ 21. Peak is not Muslim and never told Esparza he was Muslim, or that he had studied Islam. Resp. DSOF ¶ 75. Peak thought the Mayweather text was racially offensive, and implied that he was paid $100 million to engage in sexual relations. Resp. DSOF ¶ 76; PSOAF ¶ 22. Peak testified that he thought the Jehovah's Witness comment was directed at him because he had been door-to-door canvassing, and his son and son's mother were Jehovah Witnesses, although he does not dispute that Pagano sent that text after

Pagano, Damato, Conrad, and Peak had all participated in door-to-door canvassing, and that Pagano did not know anyone in Peak's family was a Jehovah Witness. Resp. DSOF ¶ 79; *see* R. 123-3, Pagano Decl. Peak felt the message with the African American female was degrading and offensive. PSOAF ¶ 20.

### 2. Figurines

Peak contends that "[t]he worst of the behavior were the black-face figurines that were placed on his desk and given to him by Esparza." Resp. at 9. Specifically, Peak asserts that Esparza placed "homies" figurines on Peak's desk, including a figurine of a pimp standing next to several dogs. Resp. DSOF ¶ 80. Peak was offended by the figurine because the figurine had "gold jewelry hanging around his neck and on his fingers with a dog next to him" and he (Peak) "wear[s] jewelry and breed[s] dogs." Resp. DSOF ¶ 81; PSOAF ¶ 16. Peak bred Cane Corsos and texted photos of his dogs to his co-workers. Resp. DSOF ¶ 82. Peak removed the figurines from his desk. *Id.* ¶ 85. Esparza denies placing the figurines on Peak's desk, however, Esparza kept hundreds of the figurines in his office. *Id.* ¶ 86; DSOF ¶ 87. An administrative assistant, Liz Castro, claims she saw the figurines on Peak's desk for several months and asked him where he got them, to which he replied Esparza gave them to him, and Castro thought Peak appeared happy to have them. DSOF ¶ 88.

Peak also maintains that Esparza gave him a collection of purported jazz musician figurines, with musical instruments, that Peak believes were not jazz musician figures, but were instead black-face figurines. DSOF ¶¶ 92, 94.

### 3.  Miscellaneous

Peak identifies several miscellaneous interactions as supportive of his race-based harassment claim. For example, on another occasion, Esparza, after seeing Peak's car for the first time (a Cadillac Escalade), said "damn, Bobby, Escalade, huh? I'm paying you way too much." PSOAF ¶ 13. Peak also was offended by being the only employee asked to provide water for general membership meetings, at Esparza's request, and that he was also referred to as "Bobby Boucher," a reference to the movie "Waterboy." PSOAF ¶ 15.

Peak also contends he was subject to racial harassment when Esparza took a video of him swinging a golf club at a Local 1 golf outing and shared it with others. Resp. DSOF ¶ 95.

Finally, Peak asserts he was subject to racist behavior when Esparza and Damato told him that he should not wear a suit and tie to a press conference because it make him look like a "salesman." Resp. DSOF ¶ 96.

### D.  Peak's Reassignment and Complaints

In January 2017, Esparza switched Peak and fellow Business Agent Conrad's patrol areas, moving Peak from the near South Side, western suburbs, and near north side, to the north and northwest suburbs, which included Winnetka, Wilmette, Schaumburg, Bensenville, Skokie, Schaumburg, and Hoffman Estates. Resp. DSOF ¶ 50.[11] Peak claims it was unsafe for him in those areas and that Esparza put him in

---

[11]Peak alleges that it was in the Fall of 2017 when he was assigned to patrol Northwestern suburbs such as Winnetka, Wilmette, Schaumburg, and Bensenville, PSOAF ¶ 24, however, the record, including Peak's Complaint, and his responses to Defendants' statements of fact, supports that reassignment was made in January 2017. *See*

harm's way by assigning him to such areas because of their predominantly white populations. DSOF ¶ 51. Peak testified he was subject to racial comments in those areas, and even had the police called on him when he was campaigning in Villa Park. Resp. DSOF ¶ 51. Peak says he was subject to humiliating conduct by contractors in the northwest suburb areas, including "snicker[ing]," "sneers," a lack of "cooperation" from the contractors and being called "dumbass," and that he would receive snide remarks. Resp. DSOF ¶ 52; PSOAF ¶ 25. However, Peak only recalled one verbal threat of violence when he was told by a non-union contractor get off the job site, or else the contractor would "F him up." Resp. DSOF ¶ 53. Peak was called a "Black MF" at a jobsite he was assigned by Esparza, but could not recall who made the statement, and he did not recall other racial slurs or epithets. *Id.*; Resp. DSOF ¶ 49; PSOAF ¶ 25. Peak acknowledges that neither Esparza, nor any Local 1 representative or agent, ever used any racial epithets or slurs in his presence, and he was never physically threatened by anyone in Local 1. Resp. DSOF ¶ 60. Peak testified he was uncomfortable when working in this new area because they were "predominantly White neighborhoods." Resp. PSOAF ¶ 25.

Peak maintains he was discriminated against when he was reassigned to an area where he was subject to racial harassment by white contractors and had police called on him, and where he was assigned to patrol by himself when past practice was

---

Resp. DSOF ¶¶50, 97; Am. Compl. ¶ 46 ("On January 16, 2017, changed [sic] ESPARZA changed Plaintiff's work assignment to a less desirable location, causing him to have to drive more distance and making him less productive.").

to patrol with a partner in areas where a Business Agent was being harassed. Resp. DSOF ¶ 97.

Whether Peak complained of harassment or a hostile work environment is disputed by the parties. Defendants contend that he did not, and only complained to Local 1 management, specifically Flanagan, regarding his dislike of being reassigned by Esparza to patrol north and northwest suburbs. DSOF ¶¶ 48–49; *see* Esparza Decl. ¶¶ 15–16; Flanagan Decl. ¶¶ 2–4. On the other hand, Peak testified that he told Flanagan he was upset by the reassignment, and that he was being mistreated by "predominantly white superintendents and general contractors" at jobsites in the northwest suburbs. Resp. DSOF ¶ 54; PSOAF ¶ 27.

Further, Peak maintains that he complained to Flanagan about harassment and offensive conduct when he was assigned different work locations by Esparza. Resp. DSOF ¶ 48. Peak contends that he complained to Flanagan because the police were called upon him in Villa Park, and he heard racially offensive remarks at job sites. *Id.* ¶ 49. Flanagan denies that Peak complained to him about the reassignment or mistreatment by contractors, and also denies telling Esparza that Peak spoke to him about any "humiliating" treatment by contractors. DSOF ¶¶ 57–58. Peak also contends that he spoke to Esparza on one occasion about his reassignment and asked him why he was reassigned, and Esparza told him to "suck it up." Resp. DSOF ¶ 55; PSOAF ¶ 29. Peak further testified that he told Esparza he was not as familiar with the contractors, subcontractors, and others in the reassigned area. Resp. PSOAF ¶ 29. However, Peak never complained to Esparza about the purported mistreatment

20

by contractors after the reassignment, just that Peak was out of his element when his patrol area was switched. DSOF ¶ 56; Resp. DSOF ¶ 56.

### E. Peak's Arrest, Local 1's Investigation, and Peak's Termination

On January 7, 2018, Peak was arrested for solicitation of prostitution and possession of a controlled substance while driving his Local 1-owned vehicle. Resp. DSOF ¶ 34. Esparza was made aware of the arrest when the Chicago Police Department (CPD) contacted Local 1's office to notify them of Peak's impounded vehicle, and CPD also faxed the police report from the arrest to Local 1's office. *Id.* ¶ 35. Photos from Peak's vehicle show drug paraphernalia, condoms, and a pornographic video. *Id.*

Following the arrest, Esparza suspended Peak and initiated an investigation which included performing a criminal background check. Resp. DSOF ¶ 37. Esparza received the results from the criminal background check on January 16, 2018. *Id.* The results included a 2012 felony conviction for cocaine possession. *Id.*[12]

Esparza then contacted Local 1's legal counsel, Robert Bloch, to ascertain what, if any, effect Peak's felony conviction would have on his employment with Local 1. DSOF ¶ 38. Bloch advised Esparza that federal law prohibited Local 1 from

---

[12]Peak asserts that the conviction date was 2009, not 2012. Resp. DSOF ¶ 37. However, review of the criminal background record itself confirms the disposition date of the possession of cocaine charge as July 16, 2012. *See* R. 123-2, Exh. 9, Criminal Background Results at Defs 000085. Either way, the conviction date does not impact the Court's analysis given Peak's termination occurred in 2018, which was within 13 years of 2009 or 2012. *See* 29 U.S.C. § 504(a)(5) (restricting individuals from serving in any capacity in a labor organization other than as a member for "the period of thirteen years after such conviction or after the end of such imprisonment, whichever is later[.]").

continuing to employ Peak because of the felony cocaine conviction. *Id.* Esparza decided to terminate Peak following this legal advice. *Id.* ¶ 39.[13] On January 17, 2018, Local 1's legal counsel notified Peak of his termination following the criminal investigation. Resp. DSOF ¶ 40. The termination letter explained:

> Following your recent arrest, Local One conducted a criminal background check, which revealed among other things a 2009 conviction for cocaine possession. Under Section 504 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. 504, this conviction bars you from serving in any capacity for a labor organization for a period of thirteen years. Due to this conviction, other convictions revealed by your background check, your failure to disclose such convictions to the Union, and your work record as a whole, Local One terminates you from employment effective immediately.

Resp. PSOAF ¶ 33; Def. Exh. 18, Termination Letter. Prior to his termination, Peak had no disciplinary actions. Resp. PSOAF ¶ 35. The next day Peak was also removed from his elected position of Auditor. *Id.* ¶ 41; Def. Exh. 19, Auditor Removal Letter.[14]

Peak contends he was told by Flanagan that if he beat his arrest, and had it expunged from his record, he would be eligible for reinstatement. Resp. DSOF ¶ 42. In March 2018, Peak contacted Chicago District Council, Christina Wernick, to set up a meeting concerning his termination, and Wernick responded that Peak submit a written request to identify "the specific issues that you would like to address in the

---

[13]Peak objects to DSOF ¶¶ 38 and 39 as "[d]isputed as Plaintiff lacks sufficient knowledge of the conversation between Leo Esparza and Robert Bloch." Resp. DSOF ¶¶ 38–39. The Court finds Peak has admitted these statements of fact as he cites nothing in the record to explain his lack of information, in violation of Local Rule 56.1(e)(3). *See Rodriguez*, 2018 WL 5994984 at *1 ("Because Plaintiffs cite nothing in the record to explain their lack of information, and thus their inability to confirm or deny the assertions, the assertions are deemed admitted to the extent they are supported by the record materials cited by Defendants.").

[14]The parties dispute whether Peak's position as "Auditor" was ceremonial or not, however the Court finds this dispute is not material to the issues presented in this case, and it is not in dispute that auditors were not employees of Local 1. DSOF ¶ 5; Resp. DSOF ¶ 5.

meeting[.]" DSOF ¶ 44. In response, Peak said he wanted to speak about his "wrongful termination" and to "address all of the issues, facts, information and proof that I have in my possession during that meeting." *Id.*; Resp. DSOF ¶ 44. No meeting ever occurred. *Id.*

After Peak was terminated, he recorded a phone call between himself and Esparza. DSOF ¶ 45. Defendants include portions of the transcript of that phone call where Peak states that he disclosed his criminal history, and Esparza responds that Peak did not disclose he was a felon. DSOF ¶ 46. Esparza also states on the recording "but it was a felony, though, Bobby. That's why. No different if I – if it was me. If I had a felony, I couldn't fucking run for anything." *Id.* Peak does not dispute the recording, but adds that "in this recording Peak told Leo that he was truthful about his conviction and Marty said, 'drugs? That's all it was for? Oh, fuck. All in favor say aye.'" Resp. DSOF ¶ 46; Peak Dep. Tr. at 109: 18–19. Although Peak insists that in the recording Esparza admits Peak disclosed his criminal background, the recording does not support that Peak disclosed his felony record to Esparza, or anyone else, prior to his hire, and suggests the opposite – that Peak did not disclose his felony record. *See* PSOAF ¶¶ 36–38 and Resp. PSOAF ¶¶ 36–38.

Peak is not aware of another Local 1 officer, employee, or Business Agent that was arrested and convicted of criminal conduct (DSOF ¶ 47), but alleges he is aware of Local 1 union members who had criminal records and were able to maintain their union position. Resp. DSOF ¶ 47. Review of Peak's deposition testimony on this point reveals that Peak admitted that the individuals he identified as having arrest

23

records, but keeping their employment with Local 1, were not employees of Local 1. Peak Dep. Tr. at 320: 2–322: 18. Peak was also asked whether he could identify any Local 1 employee after 2014 or before that was arrested during their employment with Local 1, to which he responded "No." *Id.* at 322: 15–18.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (cleaned up). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare,*

*Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

Peak brings claims against Defendants under Section 1981 for discrimination based on race (Count I), race-based harassment (Count II), and retaliation (Count III). The Court addresses each claim below.

### I.    Racial Discrimination (Count I)

In Count I, Peak alleges he was terminated "because of [his] race, African American[,]" in violation of Section 1981. Am. Compl. ¶ 75.

"Section 1981 of the Civil Rights Act of 1866 'protects the right of all persons 'to make and enforce contracts' regardless of race.' To survive summary judgment on a § 1981 discrimination claim, the plaintiff must either provide enough evidence to 'permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action,' or employ the burden-shifting framework in *McDonnell Douglas Corp. v. Green*[.]" *Oliver v. Jt. Logistics Managers, Inc.*, 893 F.3d 408, 411–12 (7th Cir. 2018) (cleaned up).[15]

"One way to prove employment discrimination is the familiar *McDonnell Douglas* burden shifting framework." *Lewis v. Indiana Wesleyan U.*, 36 F.4th 755,

---

[15]Section 1981 discrimination claims are analyzed "in the same manner as claims brought pursuant to Title VII of the Civil Rights Act. As such, we cite to both § 1981 and Title VII cases." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (cleaned up); *see also Abebe v. Health and Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 606 (7th Cir. 2022) ("Because the analysis for discrimination and retaliation is the same under both [Title VII and Section 1981], we address each set of claims together.")

759 (7th Cir. 2022) (cleaned up). Under that framework, a plaintiff is required to show that (1) he is a member of a protected class, (2) he was meeting the defendant's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Id.* If a plaintiff meets each element of a prima facie case, then the "burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The burden then shifts back to the employee to show why the employer's explanation is pretextual." *Id.* at 760. While the analysis for race discrimination claims under Title VII and Section 1981 is "largely identical," for a Section 1981 claim "a plaintiff bears the burden of showing that race was a but-for cause of his injury." *Id.* at 759 (cleaned up). While the burden shifting framework is one way to approach discrimination claims, the Seventh Circuit has instructed that the evidence should be considered as a whole to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . discharge[.]" *Ortiz v. Werner Enterprises*, 834 F.3d 760, 763 (7th Cir. 2016).

Defendants argue that the decision to terminate Peak's employment was based upon the advice of their legal counsel. Specifically, that the LMRDA bars anyone that has been convicted of a "violation of narcotics laws" from "serving as an officer or employee of a labor organization for a period of 13 years after the date of the conviction or the end of the incarceration, whichever occurs later." Memo. Summ. J. at 16 (citing LMRDA, 29 U.S.C. § 504(a)). In support, Defendants maintain that the

United States Department of Labor considers a violation of narcotics laws to include cocaine possession. *Id.* (citing U.S. Dept. of Labor's Office of Labor-Management Standards' Fact Sheet, "Prohibition Against Certain Persons Holding Union Office or Employment," available at https://www.dol.gov/agencies/olms/compliance-assistance/publications/prohibition-against-certain-persons-holding-union-office-or-employment (last accessed Jan. 10, 2024)). On that basis, argue Defendants, Peak's termination was not only lawful, but compulsory. Memo. Summ. J. at 16. Moreover, Defendants assert that Peak has not established a prima facie case of race discrimination because he has not identified any Local 1 officer, employee, or agent, of any race to have been arrested or convicted of criminal conduct. *Id.* at 17. Even if he had, Defendants posit the reasons for termination were legitimate and nondiscriminatory. Last, Defendants argue that Peak's contention that Local 1's officers knew of his conviction and hired him anyway does not change the fact that Local 1 made the decision to terminate him based on the advice of legal counsel, and even if Peak's purported disclosure to Local 1 officers pre-hire could be credited, it only shows that his initial hire was unlawful, not that his termination was unlawful. *Id.*

In response, Peak does not challenge that his conviction was disqualifying under federal law, or identify any support that his purported disclosure to Local 1 officers in advance of his hire provided some type of safe harbor from the mandates of the LMRDA. *See* Resp. 16–18. Instead, Peak argues that he has established all required elements of a prima facie case of race discrimination, and argues that "the

27

same standards were not followed across all unions when other members were allowed to keep their jobs." Resp. at 18. Specifically, Peak identifies three individuals, union *members*, that he alleges had criminal convictions and were allowed to retain their jobs. *Id.* at 17–18. Peak does not cite to any statement of fact to support his contention. *Id.*

The Court finds that Peak has not adduced evidence to support a prima facie case of race discrimination, or any evidence to suggest that his race was the but-for cause of his termination. To the contrary, it is undisputed that he had a conviction which disqualified him from employment with Local 1. Whether this was known or unknown by Local 1 officers in advance of his hire is not a genuine issue of fact that precludes summary judgment. What is undisputed is that Local 1 did not run a criminal background check on Peak prior to his hire (PSOAF ¶ 5), that a criminal background check was run following his arrest when operating a Local 1-owned vehicle (DSOF ¶ 37), and that within a day of receiving the results of the criminal background check, Peak was fired by Esparza on the advice of Local 1's legal counsel. *Id.* ¶¶ 38–40. Peak's contentions about alleged comparators do not change this result. First, and fundamentally, Peak fails to support his contention about alleged comparators with citation to a statement of fact, as required by the Local Rules, and second, as argued by Defendants, the individuals identified by Peak are union members, not employees (which Peak also admitted during his deposition), and Peak has not supported that *membership* in the union is the equivalent of *employment* by the union. Reply at 4–5. The Fact Sheet, "Prohibition Against Certain Persons

28

Holding Union Office or Employment," cited by Defendants, clearly applies to "persons holding union office or employment," and does not include union members. ("What union offices or positions can a convicted person not hold?" "Any position, other than that of a member . . ."). Peak fails to support his contention with any case law requiring a different result. *See* Resp. at 16–18.

To the extent Peak was able to establish a prima facie case of race discrimination, which he has not done, the Court also finds that Defendants have provided a legitimate, nondiscriminatory reason for his termination, namely compliance with federal law. Although Peak contends this reason was a pretext, the Court finds no evidence in the record to support his theory. *See Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (defining pretext as "a dishonest explanation, a lie, rather than an oddity or an error."). Here, Peak has not disputed the results of his criminal background check, or the timeline of Local 1's receipt of it, and quick decision to terminate thereafter. That Peak believes he disclosed his criminal record before his hire does not transform Defendants' later decision to terminate him because of a criminal record into "a dishonest explanation" or lie; at best, it shows a lack of diligence on the part of Local 1 prior to Peak's hire and Local 1's requirement in following the LMRDA. *See Sweatt*, 796 F.3d at 709.

Thus, the Court grants Defendants' Motion as to Count I.

## II.      Racial Harassment (Count II)

In Count II, Peak claims he was subject to "a course of hostile, abusive and harassing conduct based solely upon Plaintiff's race, African American." Am. Compl. ¶ 88.

To survive summary judgment on a race-based harassment claim, a plaintiff must adduce evidence sufficient to create a material issue of fact that: "(1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *See Yancick*, 653 F.3d at 544 (cleaned up). For a hostile work environment, the complained-of conduct must "be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citing *Ezell v. Potter*, 400 F. 3d 1041, 1047 (7th Cir. 2005)).

In determining whether offensive conduct is severe or pervasive enough to alter the conditions of employment and create a hostile work environment, courts consider both the actual effect of the conduct on the plaintiff (the subjective test) and what the effect would be on a reasonable person in the plaintiff's position (the objective test). *Soucie v. City of Braidwood, Ill.*, 2019 WL 1239781, at *6 (N.D. Ill. Mar. 18, 2019) (citing *Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 674 (7th Cir. 1993)). If the plaintiff "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment[.]" *Soucie*, 2019 WL 1239781, at *6 (citing *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21–22 (1993)). Likewise, conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Id.* (cleaned up). The Court must consider the "the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim." *Scaife v. U.S. Dep't of Veterans Affs.*, 504 F. Supp. 3d 893, 903 (S.D. Ind. 2020), aff'd sub nom. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109 (7th Cir. 2022) (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013)). "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago,* 713 F.3d 325, 331 (7th Cir. 2013) (cleaned up). Ultimately, the "core question for the court is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Scaife*, 504 F. Supp. 3d at 903 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Adusumilli v. City of Chicago*,

164 F.3d 353, 361 (7th Cir. 1998) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Defendants contend that the record demonstrates that Peak was not the victim of a hostile or abusive work environment, and that "he and Esparza were personal friends[.]" Memo. Summ. J. at 21. Further, Defendants argue that any claim by Peak that he felt harassed is belied by the text messages, photographs, and his own efforts to be reinstated to his position as Business Agent, none of which involved Peak raising any issues with his work environment. *Id.* Defendants maintain that Peak never complained about harassment, underscoring their position that he did not believe himself to be a victim of racial harassment. *Id.* at 22. Moreover, Defendants argue that the alleged harassment was not based upon his race, that Peak cannot connect his race to the complained-of conduct, and that the communications complained of by Peak were "friendly teasing, not actionable harassment[,]" citing *Moser v. Indiana Department of Corrections*, 406 F. 3d 895, 903 (7th Cir. 2005) for the general proposition that "Title VII is not a general code of civility, and simple teasing, offhand comments, and isolated incidents do not amount to actionable harassment." Memo. Summ. J. at 23. Regarding the figurines, Defendants assert that there is no evidence Esparza placed them on Peak's office desk because of his race, "or that the figurines had a racial character or purpose." *Id.* Finally, Defendants posit that the alleged harassment was neither severe nor pervasive. *Id.* at 24–25. Defendants acknowledge that this determination is made on a case-by-case basis considering the totality of circumstances, and argue that the Seventh Circuit requires showing "a

workplace permeated with discriminatory ridicule, intimidation, and insult" for a violation, citing *Luckie v. Ameritech Corp.*, 389 F. 3d 708, 714 (7th Cir. 2004), and other cases. Memo. Summ. J. at 25, n.13.

Peak, in response, contends that elements two and four for a hostile work environment claim are not in dispute. Resp. at 7. Namely, that the harassment was based upon Peak's race, and that there is a basis for employer liability. *Id.* In support, Peak identifies: the text message circulated by Esparza to Local 1 to announce Peak as the Business Agent, which depicted an African American male in a prison jumpsuit (Resp. at 8), the photo circulated by Esparza to compare Peak to an African American male robbing a bank (*id.*), Esparza suggesting he paid Peak too much money based upon his "toys" (*id.*), requiring Peak to provide water for Local 1 meetings (*id.*), the black-face figurines placed on Peak's desk by Esparza (*id.* at 9), and sending a message of an African American female with the message "no sign ups, no pussy." *Id.* With respect to employer liability, Peak argues his harassers – identified as Esparza, Flanagan, Damato, and Fosco – were his supervisors, and held to a higher standard than Peak's co-workers, and that they are "engaged in the abusive, humiliating, and harassing behavior towards Peak." *Id.* at 10–11. Peak contends Esparza and Flanagan cannot escape liability by relying on Peak's alleged failure to complain to his harassers about their own behavior. *Id.* at 11.

With respect to whether he was subject to unwelcome harassment, Peak argues that it suffices that he felt harassed to meet the subjective inquiry, citing *Worth v. Tyer II*, 276 F. 3d 249 (7th Cir. 2001). Resp. at 11. Peak points to his

testimony that he found multiple text messages to be degrading, humiliating, and offensive during his tenure with Local 1. *Id.* at 12–13. Peak also identifies his assignment to predominantly White neighborhoods as putting him in harm's way, that police were called on him in Villa Park, that he was called a "Black MF," and that he did not get cooperation because of his race. *Id.*[16] Peak maintains he found certain text messages degrading and offensive which he characterizes as displaying sexual harassment, gender discrimination, religion discrimination. *Id.* at 12–13. Peak maintains he did complain of the harassment to Esparza and was told to "suck it up." *Id.* at 13. Ultimately, Peak argues that "a trier of fact could find that the actions and incidents described by the Plaintiff regarding his Supervisors were both subjectively and objectively offensive." *Id.*

Finally, Peak asserts the harassment was severe and pervasive. Resp. at 13–15. In support, Peak highlights the following: being insulted about getting paid too much based on his possessions, a photo insinuating that the items at his home were a result of him robbing banks, and the circulation of a photo of a mugshot of an African American man in a prison jumpsuit when announcing Peak's hire.[17] Resp. at 14. Peak also identifies the reassignment by Esparza as putting him in harm's way, and part of the workplace conduct he was subject to, citing *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). Resp. at 15.

---

[16]Peak includes other allegations, however, he does not cite to any statement of fact to support those allegations and, on that basis, the Court disregards the allegations. Resp. at 12–13.

[17]Again, Peak includes other allegations, however, he does not cite to any statement of fact to support those allegations and, on that basis, the Court disregards the allegations. Resp. at 14–15

Reviewing the record in the light most favorable to Peak, the non-movant, as the Court must, the Court finds that Peak has adduced sufficient evidence to create an issue of material fact as to his harassment claim.

First, the Court finds there is a question of fact whether Peak, in fact, felt the conduct was unwelcome. Defendants submit that the communications evidence a friendship and brotherhood between and among the Local 1 employees, including Peak. True, certain text messages sent by Peak support this proposition. However, Peak maintains he was offended by several other text messages. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004) ("Whether words or conduct were unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the factfinder."). Further, that Peak did not complain to Esparza about Esparza's conduct is understandable given the power dynamics ("Leo was the boss" PSOAF ¶ 30), and the Court does not read into that failure that Peak was not offended by the conduct. Ultimately, the Court is in no position to resolve this factual dispute on summary judgment, as it will ultimately come down to a credibility determination who the trier of fact believes.

Additionally, while Defendants characterize Peak's purported treatment by third parties in the field as having no bearing on the harassment claim, it is undisputed that Peak was "humiliated" by certain treatment by third parties when patrolling in the field. Moreover, there is a genuine dispute of fact whether Peak complained to Flanagan regarding his purported treatment by third parties when patrolling in the field. *See Lapka v. Chertoff*, 517 F.3d 974, 984 n.2 (7th Cir. 2008)

("Employer liability can be imposed when the harassment is committed by co-workers, or by third parties.") (cleaned up). Peak's role as a Business Agent did not entail a typical office work environment, and he spent most of his time in the field. Whether the purported harassment—indisputably unwelcome—that he experienced while patrolling can fairly be described as affecting his work environment remains an open question, and one not addressed directly by either party.

Second, the Court finds whether the purported harassment of Peak was based on race to be a disputed fact. The Court disagrees with Defendants' description of the course of conduct complained of by Peak as merely "friendly teasing." Memo. Summ. J. at 23. To credit such a contention would be viewing the record in the light most favorable to Defendants, which the Court may not do. The Court is also loath to describe this series of communications, which includes allegations of repeated conduct that memes or photographs of African American men were circulated by the highest officer of Local 1, and Peak's supervisor, or other Local 1 officers, e.g. announcing Peak's hire as a Business Agent by circulating a mugshot of an African American male, or insinuating Peak was a bank robber and that is how he obtained his possessions, or placing figurines on his desk at work depicting African American males that Peak felt were offensive, as not based upon Peak's race as a matter of law for purposes of a hostile work environment claim. Defendants identify no case law where similar conduct from a direct supervisor occurred, and where a court granted summary judgment in the employer's favor.

36

Moreover, a case relied upon by Defendants underscores the difference in the fact pattern involving Peak. *See Luckie*, 389 F.3d at 713. In *Luckie*, the Seventh Circuit found that the complained-of conduct did not rise to the level of a hostile work environment as there was no evidence that the plaintiff was the target of any racial slurs, epithets, or overtly race-related behavior. *Id*. The only comment that arguably had a racial component, observed the Seventh Circuit, was not racial in character, where the comment "was made in the context of discussing the department's organization and ways to increase its efficiency." *Id*. Here, in contrast, the messages which included photos of African American men were directed to and about Peak, and there can be no reasonable inference otherwise based upon the record. Thus, the Court finds, at minimum, those communications create a genuine issue of material fact whether the complained-of conduct had a "racial character or purpose" to support Peak's hostile work environment claim. *See id*.

Third, while a close call, the Court finds the record evidence supports that certain incidents are sufficiently severe for sustaining Peak's hostile work environment claim at the summary judgment stage. *Jackson*, 474 F.3d at 499 ("It is important to recall that harassing conduct does not need to be both severe and pervasive.") This includes, but is not limited to, the communication from Esparza announcing Peak's hire with a photograph of a mugshot of an African American male, the photo insinuating that Peak's possessions were a result of him robbing banks, and Esparza giving Peak figurines that Peak maintains were black-face, including one depicting a pimp with dogs. PSOAF ¶¶ 11–12, 14, 16, 17–18 . True, Peak does not

complain of any physically threatening conduct, or use of racial epithets or slurs directed at him by Esparza or anyone else at Local 1, however this is not dispositive as to his claim. Resp. DSOF ¶ 60. Further, the complained of conduct by third parties in the field supports that Peak was the recipient of racial epithets (being called a "Black MF"), and physical threats on at least one occasion. Resp. DSOF ¶¶ 53, 49; PSOAF ¶ 25. Thus, considering the totality of the circumstances, the Court finds an issue of fact exists as to the severity of the conduct, and its impact with Peak's job, over the two-year period of Peak's employment.

Lastly, the Court considers employer liability. Here, there is no argument made by Local 1 or Esparza that they are not subject to Section 1981. While the question of employer liability is not addressed directly by Defendants, the record supports that Esparza had supervisory authority over Peak, and that Flanagan was an officer and member of the Executive Board. *See*, *e.g.*, DSOF ¶¶ 2, 4. The record also supports that Esparza was an identified harasser by Peak, such that Defendants would be strictly liable in the event Peak proves his hostile work environment claim vis-à-vis Esparza's actions towards Peak. *Hrobowski*, 358 F.3d at 477 ("Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense where the plaintiff suffered no tangible employment action.") Conversely, Defendants may be found liable where the hostile work environment was created by third parties if Peak proves that they had "been negligent either in discovering or remedying the harassment." *Id*. Whether, and to what extent, Peak complained to Flanagan and/or Esparza about third party treatment based upon his

38

race while in the field, whether that treatment constitutes actionable harassment, and whether Defendants were negligent in discovering or remedying such treatment, all remain disputed questions of fact.

Ultimately, the Court finds Peak has adduced sufficient evidence for his race harassment claim to proceed to trial as resolution of several factual disputes will necessarily impact whether the complained-of conduct rises to the level of a hostile or abusive work environment. The Court cannot find, based upon the disputed and undisputed evidence in the record, that as a matter of law the conduct complained of by Peak was not unwelcome, not based upon Peak's race, and not subjectively or objectively offensive. The Court finds that Defendants have failed to meet their burden to establish as a matter of law that material facts are undisputed such that the Court could find in its favor on Peak's racial harassment claim, and denies Defendants' Motion as to Count II on that basis.

### C. Retaliation (Count III)

In Count III, Peak claims that Defendants retaliated against him for complaining about Esparza's harassment by terminating his employment with Local 1. Am. Compl. ¶ 103.

To survive summary judgment on his retaliation claim, Peak must show evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. For purposes of retaliation, an adverse employment action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Abebe*, 35

F.4th at 607 (7th Cir. 2022) (cleaned up). On causation, retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). The Seventh Circuit has instructed that the evidence should be considered as a whole. *Ortiz*, 834 F.3d at 763. "Protected activity" is "some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Jt. Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (cleaned up). Suspicious timing alone is insufficient to establish a causal connection between the protected activity and adverse action. *Abebe*, 35 F.4th at 608.

Defendants contend that Peak never engaged in any statutorily protected activity. Memo. Summ. J. at 18. Conversely, Peak submits that he complained to Flanagan in the Spring of 2017 about "humiliating" conduct by third party contractors, and that he spoke with Esparza about the reassignment and its impact on his ability to sign-up new union members. *Id.* This, argue Defendants, is not protected activity as Peak did not complain that he was reassigned by Esparza due to his race, and his complaint about how third-party contractors treated him "is bereft of any mention to any racial animosity[.]" *Id.* Further, Defendants assert that Peak's retaliation claim fails as a matter of law because he has not adduced evidence that he would not have been discharged "but for" his alleged protected activity, identifying the six months plus timeframe between his alleged complaints and his termination, which cuts against any inference of causation. Memo. Summ. J. 19–20 (citing *Filipovic v. K&R Express Sys., Inc.*, 176 F. 3d 390, 399 (7th Cir. 1999)).

40

Peak counters that he did engage in protected activity when he complained to Local 1 management (Flanagan) about the harassment he received when he was switched to a different assignment by Esparza. Resp. at 18. In essence, Peak focuses on the treatment he purportedly received from third parties due to his race, not from Local 1 officers, employees, or agents, as the basis of his retaliation claim. *Id.* at 19. This deviates from the allegations in Peak's Amended Complaint which identifies his complaint as a complaint "regarding the severe and pervasive harassment Plaintiff was subjected to by *Leo Esparza.*" Am. Compl. 103 (emphasis added). Peak primarily argues that "suspicious tim[ing] gives rise to Defendant's retaliatory motive to terminate Peak" as the reason summary judgment must be denied. Resp. at 19.

The record is, at best, unclear whether Peak engaged in any statutorily protected activity. The record does not contain evidence that Peak complained to Local 1 management about his treatment by Esparza, beyond complaining about the reassignment from Esparza. In fact, Peak does not contend his reassignment was based upon his race.[18] However, whether Peak complained to Flanagan about his treatment by third parties which he attributes to race is disputed.

No matter, as the Court finds there is no evidence of causation between the alleged protected activity of Peak and the termination of his employment which, as described in Section I, *supra*, resulted from a criminal background check revealing

---

[18]To the extent Peak argues that his reassignment was an adverse action, the Court rejects that argument. *See, e.g., Hobbs v. City of Chicago*, 573 F. 3d 454, 463 (7th Cir. 2009) (rejecting argument that being given "undesirable assignments" which were within employee's job duties, was evidence of retaliation where there was no evidence of loss of a job title or receiving less pay).

Peak's disqualifying conviction. Although Peak points to "suspicious tim[ing]" as supportive of causation, the Court finds this is not supported by the record evidence as purported complaints were made in Spring 2017, and the termination took place in January 2018. Resp. at 19. In any event, suspicious timing alone is insufficient to sustain a retaliation claim, and Peak has not identified case law supporting causation on such an attenuated timeline. *Abebe*, 35 F.4th at 608. Based upon the undisputed record evidence, the Court finds that Local 1 advanced legitimate business reasons, mandated by federal law, for Peak's termination, which undermine Peak's theory of causation between his purported complaints and the termination. Further, the decision to terminate his employment was made within one day of receiving the results of the criminal background check, bolstering Defendants' contention that the criminal conviction was the reason for Peak's termination. Thus, considering the undisputed evidence as a whole, as the Court must, there is no evidence the complained of actions taken by Local 1 or Esparza were casually related to Peak's complaints.

Without having produced sufficient evidence that his termination was casually related to any complaints, Peak's retaliation claim cannot proceed to trial. Defendants' Motion with regard to Count III is granted.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [122] is granted in part and denied in part.

By February 2, 2024, the parties are directed to file a status report indicating: (1) whether the parties would like a referral to the Magistrate Judge for a settlement

conference; (2) whether the parties consent to proceeding with trial before the Magistrate Judge, (3) whether the parties consent to a bench trial, (4) the anticipated number of days for trial (accounting for *voir dire*), and (5) the expected number of witnesses.

Dated: January 19, 2024

United States District Judge
Franklin U. Valderrama